STATE OF NORTH CAROLINA v. L. H. YELVERTON, JR.

No. 485A91

(Filed 10 September 1993)

1. **Criminal Law § 76 (NCI4th)— pretrial publicity—change of venue**

When the trial court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either transfer the case to another county or order a special venire. A trial should be held in a county different from the one in which a crime was allegedly committed only in rare cases, however, because of the significant interest of county residents in seeing criminals who commit local crimes being brought to justice.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

**Pretrial publicity in criminal case as affecting defendant's right to fair trial—federal cases. 10 L. Ed. 2d 1243.**

STATE v. YELVERTON

[334 N.C. 532 (1993)]

2. **Criminal Law §§ 76, 77 (NCI4th) — pretrial publicity — change of venue — test and burden of proof**

The test for determining whether venue should be changed is whether it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed. Defendant has the burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

**Pretrial publicity in criminal case as affecting defendant's right to fair trial — federal cases. 10 L. Ed. 2d 1243.**

3. **Criminal Law § 76 (NCI4th) — pretrial publicity — change of venue — discretion of court**

The determination of whether a defendant has carried his burden of showing that pretrial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. The trial court has discretion, however, only in exercising its sound judgment as to the weight and credibility of the information before it, including evidence of such publicity and jurors' averments that they were ignorant of it or could be objective in spite of it. When the trial court concludes, based upon its sound assessment of the information before it, that the defendant has made a sufficient showing of prejudice, it must grant defendant's motion as a matter of law.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

**Pretrial publicity in criminal case as affecting defendant's right to fair trial — federal cases. 10 L. Ed. 2d 1243.**

4. **Criminal Law § 79 (NCI4th) — word-of-mouth publicity — denial of change of venue**

Defendant failed to carry his burden of showing any reasonable likelihood that pretrial, word-of-mouth publicity

might have affected the fairness of his trial for first-degree murder, rape, burglary, kidnapping and aggravated assault, and the trial court properly denied defendant's motion for a change of venue, where counsel for the State and for the defense scrupulously asked members of the venire whether they had read or heard about this case from any source; those who admitted to having any difficulty putting aside previously formed opinions were excused for cause; and those who remained and were impaneled stated without exception either that they had formed no opinion or that they could put what they had heard or read out of their minds and listen objectively to the evidence before them.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

**Pretrial publicity in criminal case as affecting defendant's right to fair trial—federal cases. 10 L. Ed. 2d 1243.**

5. **Jury §§ 142, 153 (NCI4th)— capital case—prospective jurors— voir dire—when death penalty appropriate—refusal to permit questions**

The trial court did not abuse its discretion in refusing to permit defendant to ask prospective jurors in a capital trial questions regarding when in their opinion the death penalty would be appropriate, including questions as to whether they would find it impossible to vote for life imprisonment where torture or rape had been involved or whether their general approval of the death penalty would interfere with their ability to consider the existence of mitigating circumstances, where defendant was consistently permitted to ask jurors whether they would automatically vote for the death penalty upon conviction, and none of the rejected questions amounted to a proper inquiry as to whether the jury could follow the law.

**Am Jur 2d, Jury § 202.**

6. **Jury § 203 (NCI4th)— prospective jurors—knowledge about case—denial of challenges for cause**

The trial court did not err in the denial of defendant's challenges for cause of a prospective juror who knew the vic-

tims and had heard and read about the case and another pro-
spective juror who owned a store near the crime scene, knew
defendant's family, and had heard much discussion about the
crimes, where these two potential jurors were thoroughly ques-
tioned with regard to whether their familiarity with the case
might taint their ability to be fair and impartial in rendering
a verdict, and their testimony demonstrated a conscientious
and deliberate resolve to put familiarity and possible prejudice
aside and to abide by the law and the trial court's instructions.

**Am Jur 2d, Jury § 276.**

7. **Jury § 227 (NCI4th) — death penalty views — equivocation —
excusal for cause**

The trial court did not err in allowing the State's challenge
for cause of a prospective juror because of his capital punish-
ment views where the voir dire answers of the juror showed
his unwavering reluctance to recommend the death penalty
under any circumstances, and the record shows that any
equivocation in the juror's answers resulted from his expressed,
conscientious desire to do his duty as a juror and to follow
the trial court's instructions in the face of recognizing his
personal inability to impose the death penalty.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment note — beliefs regarding capital punishment as
disqualifying juror in capital case — post-Witherspoon cases.
39 ALR3d 550.**

8. **Homicide § 556 (NCI4th) — felony murder based on first-degree
burglary — intent to rape — instructions on lesser offenses not
required**

In a felony murder prosecution based on the felony of
first-degree burglary wherein the State chose to rely upon
rape for the felonious intent element of burglary, the State's
evidence was positive and uncontradicted as to each element
of burglary based on the intent to commit rape so that the
trial court did not err by refusing to submit to the jury the
lesser included offenses of second degree murder and involun-
tary manslaughter where the evidence tended to show that,
although defendant first demanded money when he entered
the victims' home, almost immediately afterwards he ordered
the female victim to disrobe and raped her. This was ample

evidence from which the jury could infer that defendant entered the victims' home with the intent to commit rape, and evidence that defendant also intended to commit other offenses against the victims, including larceny, does not conflict with the evidence that he intended to commit rape.

**Am Jur 2d, Homicide § 525.**

9. **Homicide § 199 (NCI4th)— felony murder—heart attack by victim—proximate cause of death**

The State's evidence was sufficient to show that defendant's actions were the proximate cause of the victim's death so as to support his conviction of felony murder where it tended to show that defendant broke into and entered the victim's home, attacked the victim and his wife with a dust mop, and took a gun away from the wife; the seventy-one-year-old victim collapsed and died; the victim suffered from a badly diseased heart, emphysema, fibrosis of the lungs, a malignant lung tumor, and high blood pressure; and a pathologist opined that the cause of the victim's death was acute heart failure induced by multiple blunt impact injuries to the hands and arms, although such defensive wounds, which could have been caused by a mop handle, would not be fatal to a healthy person.

**Am Jur 2d, Homicide §§ 74, 75.**

10. **Criminal Law § 775 (NCI4th)— voluntary intoxication—insufficient evidence to require instruction**

The trial court did not err by refusing to instruct on voluntary intoxication where there was some evidence that defendant had drunk "a right smart amount" of beer and liquor at a party and had smoked crack cocaine with a companion on the evening of the crimes; the only evidence that defendant was in any way affected by his drinking and smoking of crack was defendant's statement to officers that he did not deny having committed the crimes but had no memory of having done so; and a victim and the man with whom defendant smoked crack both testified that defendant appeared to be rational and showed no other physical signs of intoxication.

**Am Jur 2d, Homicide § 131.**

STATE v. YELVERTON

[334 N.C. 532 (1993)]

**11. Evidence and Witnesses § 315 (NCI4th)— defendant's rape of second victim—admissibility to show identity, motive and intent—probative value**

Evidence of defendant's rape of a second victim a few hours after his rape of the victim in this case was admissible to show identity, motive and intent, and the probative value of such evidence was overwhelming and not outweighed by the danger of unfair prejudice, where defendant was identified by both victims; both victims identified the car in which each was kidnapped; both victims were forced to accompany defendant at gunpoint; both were raped in the back seat of the car; and both were forced out of the car and abandoned in a rural area. In addition, the second victim's testimony was probative as to defendant's defense of voluntary intoxication. N.C.G.S. § 8C-1, Rules 403, 404(b).

**Am Jur 2d, Rape § 71.**

**Admissibility, in rape case, of evidence that accused raped or attempted to rape person other than prosecutrix. 2 ALR4th 330.**

**12. Criminal Law § 1199 (NCI4th)— sentencing—non-capital felonies—"catchall" mitigating circumstance found by jury for capital crime—erroneous adoption by court**

The trial court erred by adopting the "catchall" mitigating circumstance found by the jury for the capital crime of first-degree murder when imposing sentences for kidnapping, aggravated assault and armed robbery without indicating in the record its conclusion as to exactly what the circumstance denoted, since the trial court could not have known what mitigating evidence the jury considered in finding this circumstance in the capital case and thus could not have given the sentencing decision in the non-capital felony cases the individualized consideration to which defendant is entitled under the Fair Sentencing Act.

**Am Jur 2d, Criminal Law § 599.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Hudson, J., at the 14 January 1991 Criminal Session of Superior Court, Greene County, on a jury verdict finding defendant guilty of first-

degree murder. On 27 August 1992 this Court allowed defendant's motion to bypass the Court of Appeals on his appeals from additional judgments for first-degree rape (two counts), first-degree kidnapping, armed robbery, and assault with a deadly weapon with intent to kill inflicting serious injury. Heard in the Supreme Court 12 April 1993.

> *Michael F. Easley, Attorney General, by Jeffrey P. Gray, Assistant Attorney General, for the State.*

> *Harry H. Harkins, Jr., for defendant-appellant.*

WHICHARD, Justice.

The jury found defendant guilty of murder in the first degree under the felony murder rule, first-degree rape (two counts), first-degree burglary, first-degree kidnapping, armed robbery, and assault with a deadly weapon with intent to kill inflicting serious injury. We find no error in defendant's capital trial nor in any part of the trial relating to the rape charges. With regard to the kidnapping, armed robbery, and assault convictions, however, we conclude that defendant is entitled to have the charges remanded for resentencing.

Evidence presented by the State tended to show that in the early morning hours of 2 December 1989 defendant broke into the home of his neighbors, John and Edna Sutton. The Suttons were awakened by defendant's entry and confronted him in the hallway. Mrs. Sutton fired a warning shot with a pistol. According to her testimony, defendant then attacked the Suttons with a dust mop and seized the gun. Mr. Sutton, a seventy-one-year-old retired farmer with a diseased heart, collapsed and died from an apparent heart attack. Defendant then demanded money from Mrs. Sutton, took money from her purse, raped her at gunpoint, took her purse and her car keys, and forced her to leave with him in her car. Defendant drove to a remote area, raped Mrs. Sutton again, then forced her to get out of the car and crawl through a ditch into some briars, where he shot her in the back of the head. Mrs. Sutton then heard defendant drive off in her car. She walked to a nearby trailer where the occupant called the sheriff.

At approximately 5:30 a.m. the same day a man identified by the victim as defendant robbed, kidnapped, and raped the manager of a convenience store in Raleigh. The victim testified her assailant

was driving a car that matched a photograph of Mrs. Sutton's car.

Defendant surrendered to law enforcement authorities on 3 December 1989. In an interview with officers, he stated he did not deny that he committed the crimes, but that he could not remember having done so.

Following a capital sentencing proceeding the jury was unable unanimously to recommend punishment, and the trial court imposed a life sentence for the murder conviction pursuant to N.C.G.S. § 15A-2000(b) (1988). Defendant was sentenced, in addition, to life imprisonment for each of the two rape counts, forty years imprisonment each for the kidnapping and the armed robbery, and twenty years imprisonment for the assault, all to be served consecutively. Defendant received no separate sentence for the burglary, which was merged with the murder for judgment.

Defendant's first assignment of error concerns the trial court's denial of defendant's motion for a change of venue under N.C.G.S. § 15A-957. The trial court made extensive findings of fact, taking into account two newspaper articles covering the Sutton assaults and two television news videos covering the crime and defendant's arrest. It concluded that the media reports had been fact-based, neutral, and non-prejudicial towards defendant, and that neither descriptions of the alleged crimes nor depictions of defendant had been inflammatory. Defendant contends the trial court erred in failing to take into account excessive pre-trial word-of-mouth publicity.

[1] When "the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial," the trial court must either transfer the case to another county or order a special venire. N.C.G.S. § 15A-957 (1988). A trial should be held in a county different from the one in which a crime was allegedly committed only in rare cases, however, because of the significant interest of county residents in seeing criminals who commit local crimes being brought to justice. *State v. Jerrett*, 309 N.C. 239, 254, 307 S.E.2d 339, 347 (1983).

[2, 3] The test for determining whether venue should be changed is whether "it is reasonably likely that prospective jurors would base their decision in the case upon pre-trial information rather than the evidence presented at trial and would be unable to remove

STATE v. YELVERTON

[334 N.C. 532 (1993)]

from their minds any preconceived impressions they might have formed." *Id.* at 255, 307 S.E.2d at 347. The burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried rests upon the defendant. *State v. Madric,* 328 N.C. 223, 226, 400 S.E.2d 31, 33 (1991). "In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial." *Jerrett,* 309 N.C. at 255, 307 S.E.2d at 348. The determination of whether a defendant has carried his burden of showing that pre-trial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. *Madric,* 328 N.C. at 226, 400 S.E.2d at 33. The trial court has discretion, however, only in exercising its sound judgment as to the weight and credibility of the information before it, including evidence of such publicity and jurors' averments that they were ignorant of it or could be objective in spite of it. When the trial court concludes, based upon its sound assessment of the information before it, that the defendant has made a sufficient showing of prejudice, it must grant defendant's motion as a matter of law. *See State v. Abbott,* 320 N.C. 475, 478, 358 S.E.2d 365, 368 (1987).

[4] Defendant argues the pre-trial atmosphere in his case, like that in *Jerrett,* prejudiced the jury against him and precluded a fair and impartial trial. In *Jerrett* this Court applied its recognition in *State v. Boykin,* 291 N.C. 264, 271, 229 S.E.2d 914, 918 (1976), that "there may be cases where widespread, word-of-mouth publicity may be as damaging to a defendant's right to an impartial trial as mass media publicity." There is no question that word-of-mouth publicity, like television, radio, and newspaper coverage of a crime, can infect public objectivity, particularly in a small community. *See Jerrett,* 309 N.C. at 256, 307 S.E.2d at 348. The record in this case reveals, however, that counsel for the State and for the defense scrupulously asked members of the venire whether they had read or heard about this case from any such source. Those who admitted to having any difficulty whatsoever putting aside previously formed opinions were excused for cause. Those who remained and were impaneled stated without exception either that they had formed no opinion or that they could put what they had heard or read out of their minds and listen objective-

ly to the evidence before them. Given that all the jurors who previously had heard about the case averred that their objectivity was unaffected by that exposure, and given that defendant was unable to identify a single juror who remained tainted by public opinion, we hold that defendant has failed to carry his burden of showing any reasonable likelihood that pre-trial, word-of-mouth publicity might have affected the fairness of his trial and that the trial court therefore properly denied defendant's motion for a change of venue.

[5] Defendant next contends the trial court erred in refusing to permit him to question prospective jurors regarding when in their opinion the death penalty would be appropriate. He asked, for example, whether they would find it impossible to vote for life imprisonment where torture or rape had been involved or whether their general approval of the death penalty would interfere with their ability to consider the existence of mitigating circumstances. Notably, defendant was consistently permitted to ask jurors specifically whether they would automatically vote for the death penalty upon conviction, the question to which the United States Supreme Court held capital defendants entitled under the Due Process Clause of the Fourteenth Amendment in *Morgan v. Illinois*, 504 U.S. ---, 119 L. Ed. 2d 492 (1992).

Defendant relies on general language about the importance of *voir dire* in *Morgan* in arguing he was constitutionally entitled to ask such broader questions. There is no denying that "part of the guaranty of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id.* at ---, 119 L. Ed. 2d at 503. Within this broad principle, however, the trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled; its rulings in this regard will not be reversed absent a showing of abuse of discretion. *E.g., State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980); *State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757 (1979).

In *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 684, *reh'g denied*, --- U.S. ---, 123 L. Ed. 2d 503 (1993), the trial court barred defense counsel from asking similar questions of members of the venire. We held that the trial court, in so doing, acted well within its discretion: "Counsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by

which the juror should be guided. . . . Jurors should not be asked what kind of verdict they would render under certain named circumstances." *Id.* at 404, 417 S.E.2d at 772 (*quoting State v. Phillips,* 300 N.C. at 682, 268 S.E.2d at 455).

As in *Hill,* we hold here that defendant has shown no abuse of the trial court's discretion where "none of the rejected questions amounted to a proper inquiry as to whether the jury could follow the law." *Id.*

[6] Defendant's third assignment of error asserts that the trial court abused its discretion in not allowing defendant's challenge for cause of two members of the venire who, defendant alleges, had "formed or expressed an opinion as to the guilt or innocence of the defendant." N.C.G.S. § 15A-1212(6) (1988). Defendant was compelled to exercise peremptory challenges to excuse Mrs. Hill, who stated she had known Mrs. Sutton for twenty years and had supervised Mrs. Sutton for twelve years at the plant where they worked. Mrs. Hill had known Mr. Sutton through her association with Mrs. Sutton and because her brother was related to him through marriage. Although Mrs. Hill said she had heard and read about the case, she stated clearly that this familiarity would not affect her ability to be objective: "I don't think it would bother my judgment of the decision and I would go by the law."

Mr. Hill, the other juror whom defendant excused, stated that he owned a store located only two or three miles from the crime scene and knew defendant's mother, father, and brother. He stated that people came into the store and "talk[ed] about [the crime] all the time," and that he knew "all about it." Although Mr. Hill admitted that in the past he had formed and probably had expressed an opinion about the case, he stated unequivocally what he would do as a juror: "I would have to hear what was presented here in court in order for me to make a decision. . . . You've got a man's life at stake. . . . And I would have to be very fair. That's my own heart." Repeatedly asked whether his previous knowledge of the case might in some way enter into his decision regarding defendant's guilt, Mr. Hill responded:

> Not making the decision, no. I'll think about what had happened and what I've heard in court. But as far as reaching a decision myself, after I have heard the evidence and stuff; no, it wouldn't. . . . You know, you don't think about what's happened. I remember when it all happened. I'm sure I'm

going to think about it. But all I'm supposed to do, I think, as a juror and as a citizen of the state, is to hear what is presented in this case and that alone. Is that not true?

It is the trial court's duty "to supervise the examination of prospective jurors and to decide all questions relating to their competency." *State v. Black*, 328 N.C. 191, 196, 400 S.E.2d 398, 401 (1991) (*quoting State v. Young*, 287 N.C. 377, 387, 214 S.E.2d 763, 771 (1975), *judgment vacated in part on other grounds*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976)). The trial court has the opportunity to see and hear the juror on *voir dire* and, having observed the juror's demeanor and made findings as to his credibility, to determine whether the juror can be fair and impartial. *See State v. Kennedy*, 320 N.C. 20, 26, 357 S.E.2d 359, 363 (1987). For this reason, among others, it is within the trial court's discretion, based on its observation and sound judgment, to determine whether a juror can be fair and impartial. *Id.* at 28, 357 S.E.2d at 364.

The record reveals that these two potential jurors were thoroughly questioned with regard to whether their familiarity with the case might taint their ability to be fair and impartial in rendering a verdict. Their testimony demonstrated a conscientious and deliberate resolve to put familiarity and possible prejudice aside and to abide by the law and the trial court's instructions. Given the serious assurances of Mr. and Mrs. Hill that they would be able to assess the evidence objectively, we conclude that the trial court did not err in denying defendant's motion to excuse them for cause.

[7] Defendant similarly contends the trial court erred in permitting the State to challenge a prospective juror on "death qualification" grounds. A prospective juror may be excluded for cause because of his views on capital punishment if those views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *State v. Cummings*, 326 N.C. 298, 306, 389 S.E.2d 66, 70 (1990) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985)). Excusal for cause is proper when a juror admits "a specific inability to impose the death penalty under any circumstances." *State v. Oliver*, 302 N.C. 28, 39, 274 S.E.2d 183, 191 (1981).

The State's *voir dire* of this prospective juror showed his unwavering reluctance to recommend the death penalty under any circumstances:

STATE v. YELVERTON

[334 N.C. 532 (1993)]

Q. How do you feel about a death sentence?

A. Well, in some cases I might feel like some people deserve it, but I wouldn't want to be the one that rendered the judg[ ]ment on that.

Q. I see. So you do not feel that under any facts and circumstances that you would be able to return such a verdict?

A. I think it would bother my conscience.

Q. Well, sir, again, I need for you to answer that question directly and tell me whether or not you feel that you would be able to return a death sentence under any facts and circumstances?

A. I don't think I could return a verdict.

Upon being questioned by defense counsel, the prospective juror repeated his position that some defendants might "deserve" the death penalty, but that he "wouldn't want to be the one that judged the person in that situation." Defense counsel then asked repeatedly whether the prospective juror could follow the court's instructions relating to the imposition of a possible death sentence or life imprisonment. Although he answered that he could follow such instructions, the prospective juror steadfastly indicated reluctance or uncertainty as to his ability to "carry out [his] duties as a juror in regard to those things," and subsequently affirmed he would be unable to "carry through and do those things as a juror even though it might be an unpleasant task."

The record demonstrates that any equivocation in the prospective juror's answers resulted from his expressed, conscientious desire to do his duty as a juror and to follow the trial court's instructions in the face of recognizing his personal inability to impose the death penalty. We hold excusal of this prospective juror for cause was proper under the standard articulated in *Oliver* and that the trial court did not err.

[8] Defendant next contends the trial court erred in refusing to submit lesser-included offenses to the murder charge. Involuntary manslaughter and second-degree murder are lesser-included offenses supported by an indictment charging murder in the first degree. *E.g., State v. Thomas*, 325 N.C. 583, 591, 386 S.E.2d 555, 559 (1989). A defendant is entitled to a charge on a lesser-included offense when there is some evidence in the record supporting the lesser

offense. *Id.* at 593, 386 N.C. at 561. Conversely, "[w]here the State's evidence is positive as to each element of the offense charged and there is no contradictory evidence relating to any element, no instruction on a lesser included offense is required." *Id.* at 594, 386 S.E.2d at 561; *State v. Peacock*, 313 N.C. 554, 558, 330 S.E.2d 190, 193 (1985). "[W]hen the law and evidence justify the use of the felony-murder rule, then the State is not required to prove premeditation and deliberation, and neither is the Court required to submit to the jury second-degree murder or manslaughter unless there is evidence to support it." *State v. Strickland*, 307 N.C. 274, 292, 298 S.E.2d 645, 657 (1983) (*quoting State v. Wall*, 304 N.C. 609, 613, 286 S.E.2d 68, 71 (1982)).

The State relied upon first-degree burglary to support its prosecution of the murder charge under the theory of felony murder. First-degree burglary is the breaking or entering of an occupied dwelling house in the nighttime with the intent to commit a felony therein. N.C.G.S. § 14-51 (1986); *State v. Cooper*, 288 N.C. 496, 499, 219 S.E.2d 45, 47 (1975). The indictment charged that defendant "broke and entered [the Sutton house] with the intent to commit felonies therein, to wit: larceny, armed robbery, rape, murder and kidnapping." The State elected to proceed on the intent to commit rape as the felony underlying the first-degree burglary charge. Defendant now contends the evidence on the burglary charge was conflicting insofar as there was evidence that he broke and entered the Sutton house with intent to commit larceny. Defendant argues that such conflicting evidence on the element of his intent to commit a felony is conflicting evidence on an element of the felony murder charge. If it was his intention to commit only larceny, defendant argues, then he was entitled to instructions on second-degree murder and involuntary manslaughter.

Intent is a mental attitude that ordinarily must be proved by circumstances from which it can be inferred. *State v. Little*, 278 N.C. 484, 487, 180 S.E.2d 17, 19 (1971). "The intent with which an accused broke and entered may be found by the jury from evidence as to what he did within the house." *State v. Bell*, 285 N.C. 746, 750, 208 S.E.2d 506, 508 (1974) (*quoting State v. Tippett*, 270 N.C. 588, 594, 155 S.E.2d 269, 274 (1967)). Although the felonies actually committed after the house was entered are not necessarily proof of the intent requisite for the crime of burglary, they are evidence from which such intent may be found. *Id.*

In choosing to rely upon rape as the felony underlying the burglary charge, the State elected to prove that it was defendant's intent to commit rape upon entry. It may have been defendant's intention to commit other felonies as well, including kidnapping and robbery, as charged in the indictment. The intent to commit one felony does not foreclose the simultaneous intent to commit others. The State need not prove one felonious intention *and* the exclusion of all others; it need only prove that defendant intended to commit at least one of the felonies cited in the indictment. *See State v. Joyner*, 301 N.C. 18, 30, 269 S.E.2d 125, 133 (1980) (error to instruct defendant intended to commit rape or larceny when indictment charged only larceny, but harmless because jury found defendant had committed both); *see also State v. McDougall*, 308 N.C. 1, 10-12, 301 S.E.2d 308, 315 (1983) (underlying felonies stated disjunctively; unanimous jury verdict, as instructed, presumed as to both).

With regard to the felonious intent to commit rape, the evidence tended to show that although defendant first demanded money, almost immediately afterwards he ordered Mrs. Sutton to disrobe and raped her. This is ample evidence from which the jury could infer that defendant entered the Suttons' house with the intent to commit rape. Evidence that defendant also intended to commit other offenses against the Suttons does not conflict with evidence that he intended to commit rape, but is, under these circumstances, irrelevant for purposes of proof of burglary and, it follows, of felony murder. We hold that the State's evidence was positive as to each element of burglary based on the intent to commit rape, and no evidence contradicted any element of this charge. *Cf. State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (some evidence that, while defendant was driving, companion shot at street signs and not deliberately into residences could have supported alternative verdict of involuntary manslaughter). Thus the trial court did not err in refusing to submit the lesser-included offenses of second-degree murder and involuntary manslaughter to the jury.

[9] Defendant next contends the State failed to show his actions were the proximate cause of Mr. Sutton's death and that the trial court therefore erred in refusing to dismiss the felony murder charge. The pathologist who performed an autopsy on the decedent testified that at the time of his death Mr. Sutton suffered from a badly diseased heart, emphysema, fibrosis of the lungs, a malignant lung tumor, and high blood pressure. He opined that the

cause of Mr. Sutton's death was "acute heart failure induced or caused by multiple blunt impact injuries" to the hands and arms and that such defensive wounds, which could have been caused by a mop handle, would not be fatal to a healthy person.

Defendant concedes that the law on this question is clear: "one who inflicts an injury on another and thereby accelerates his death shall be held criminally responsible therefor." *State v. Luther*, 285 N.C. 570, 575, 206 S.E.2d 238, 241-42 (1974) (quoting 40 Am. Jur. 2d, *Homicide* § 16 (1968) ). *See also State v. Atkinson*, 298 N.C. 673, 681-82, 259 S.E.2d 858, 863-64 (1979) (victim was a "walking bombshell" on account of preexisting heart disease); *State v. Cummings*, 46 N.C. App. 680, 685, 265 S.E.2d 923, 926, *aff'd*, 301 N.C. 374, 271 S.E.2d 277 (1980) (defendant must accept his victim in the condition that he finds him). The evidence was overwhelming that Mr. Sutton died as the result of trauma caused by defendant's entry and subsequent actions. We therefore hold that the trial court did not err in refusing to dismiss the murder charge.

[10] Defendant also contends the trial court erred in refusing to instruct the jury on voluntary intoxication. There was some evidence that defendant had drunk "a right smart amount" of beer and liquor at a party Friday evening and that he had smoked crack cocaine with a companion between 10:45 and 11:45 p.m. The companion testified defendant was not noticeably intoxicated either before or after smoking the "crack," and Mrs. Sutton testified that defendant talked and looked normal, walked and drove without difficulty, and appeared to be in his right mind.

To be entitled to an instruction on voluntary intoxication, a defendant "must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a[n] . . . intent" to commit the offense. *State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988). "The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Id.* (*quoting State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) ). Viewed in the light most favorable to defendant, the evidence tended to show only that defendant had indulged in intoxicating substances. Except for defendant's statement to officers that he did not deny having committed the crimes but had no memory of having done so, there was no evidence

STATE v. YELVERTON

[334 N.C. 532 (1993)]

that defendant was in any way affected by his drinking and smoking crack earlier in the evening. To the contrary, Mrs. Sutton and the man with whom defendant smoked the crack both testified that defendant appeared to be rational and showed no other physical signs of intoxication. We hold that defendant failed to produce *substantial* evidence that his mind and reason were so completely overthrown by intoxicating substances as to render him utterly incapable of forming an intent to rape. The trial court thus did not err in refusing to give this instruction.

[11] Defendant next contends the trial court erred in admitting the testimony of the woman he raped in Raleigh near dawn on 2 December 1989. The trial court held a *voir dire* of the victim's testimony and ruled it admissible under N.C.G.S. § 8C-1, Rule 404(b), to show a common scheme, defendant's state of mind, intent, and identity. Defendant does not contest the admissibility of this evidence under Rule 404(b), but argues "its probative value [was] substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403. We disagree.

The probative value of this testimony was overwhelming: defendant was identified by both victims; both victims identified the car in which each was kidnapped; both victims were forced to accompany defendant at gunpoint; both were raped in the back seat of the car; and both were forced out of the car and abandoned in a rural area. Evidence of the second rape strongly supported identity, motive, and intent in the rape of Mrs. Sutton. The two rapes occurred within a few hours of one another; this temporal proximity substantially enhanced the probative value of the evidence of the second rape. *See State v. Price*, 326 N.C. 56, 69, 388 S.E.2d 84, 91, *judgment vacated on other grounds and remanded*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *judgment vacated on other grounds and remanded*, --- U.S. ---, 122 L. Ed. 2d 113 (1993). In addition, the second victim's testimony was probative as to defendant's defense of voluntary intoxication. She testified that she, too, observed no signs of defendant's intoxication, and she stated that defendant admitted he had "been in trouble one time tonight already,"· and that "they" would put him in jail when "they" caught up with him.

Evidence of similar sex offenses by a defendant is admissible "unless the other offense[s] were not sufficiently similar or were too remote in time from the commission of the offense charged."

*State v. Cotton*, 318 N.C. 663, 666, 351 S.E.2d 277, 279 (1987). These offenses were neither dissimilar nor temporally remote, and the trial court did not err in admitting evidence of defendant's rape of the second victim.

[12] Finally, defendant contends the trial court failed to exercise its discretion and failed to give individualized consideration to mitigating factors under the Fair Sentencing Act, N.C.G.S. § 15A-1340.1 *et seq.*, in sentencing defendant for kidnapping, assault with a deadly weapon with intent to kill inflicting serious injury, and armed robbery. The jury answered the issues of aggravating and mitigating circumstances in the capital trial, but was unable to agree on its recommendation as to punishment for the murder charge. The trial court imposed a life sentence for the murder in accord with N.C.G.S. § 15A-2000(b). In pronouncing sentence for the kidnapping, the trial court stated, "it appears to the Court that the defendant would have a right to each one of the mitigating factors that the jury has found in its verdict sheet." The trial court similarly stated with regard to the armed robbery and assault charges that defendant had proven each of the mitigating factors "that the jury has found in the issues and recommendation form as to punishment." The mitigating circumstances found by the jury were transcribed onto a sheet entitled "Mitigating Factors" and attached to the felony judgment forms for the robbery and kidnapping offenses. For the assault judgment, this sheet is absent from the record, but the judgment form itself, like those for robbery and kidnapping, indicates that "written findings [are] set forth on the attached Findings of Factors in Aggravation and Mitigation of Punishment." The trial court's colloquy with the clerk indicates its intention to rely on the jury's recommendations for all three felonies. Among the factors listed was the "catchall" mitigating circumstance in capital cases: "Any other circumstances arising from the evidence which the Jury deems to have mitigating value."

The trial court is given "wide latitude in arriving at the truth as to the existence of aggravating and mitigating [factors]." *State v. Vandiver*, 326 N.C. 348, 354, 389 S.E.2d 30, 33 (1990) (*quoting State v. Ahearn*, 307 N.C. 584, 596, 300 S.E.2d 689, 697 (1983)). "The [F]air [S]entencing [A]ct did not remove, nor did it intend to remove, all discretion from the sentencing judge." *Ahearn*, 307 N.C. at 597, 300 S.E.2d at 697 (*quoting State v. Davis*, 58 N.C. App. 330, 333-34, 293 S.E.2d 658, 661 (1982)). "[I]n every case in which the sentencing judge is required to make findings in ag-

gravation and mitigation to support a sentence which varies from the presumptive term, each offense . . . must be treated separately, and separately supported by findings *tailored to the individual offense and applicable only to that offense." Ahearn,* 307 N.C. at 598, 300 S.E.2d at 698 (emphasis added). The trial court may exercise its discretion by agreeing with the findings of the jury in the capital case, and it may within its discretion find mitigating factors that differ from the mitigating circumstances found by the jury. *See State v. Avery,* 315 N.C. 1, 337 S.E.2d 786 (1985). When, as here, however, it adopts such jury findings as the "catchall" circumstance, without indicating its personal consideration and comprehension of that factor, it abdicates its discretion and its duty under the Fair Sentencing Act. The trial court cannot have known what mitigating evidence the jury considered in finding this circumstance in the capital case; therefore, it cannot have given the sentencing decision in these non-capital felony cases the individualized consideration to which defendant is entitled under the Fair Sentencing Act. *Ahearn,* 307 N.C. at 598, 300 S.E.2d at 698.

We thus hold that the trial court erred in adopting this circumstance without indicating in the record its conclusion as to exactly what the circumstance denoted. Because defendant was sentenced in excess of the presumptive terms for each of these three felonies, we cannot say that the error was harmless. We therefore remand the kidnapping, robbery, and assault cases for resentencing.

No. 89-CRS-1734 (First-Degree Murder): No Error.

No. 89-CRS-1738 (First-Degree Rape, two counts): No Error.

No. 89-CRS-1737 (First-Degree Kidnapping): Remanded for Resentencing.

No. 89-CRS-1736 (Assault With a Deadly Weapon With Intent To Kill Inflicting Serious Injury): Remanded for Resentencing.

No. 89-CRS-1736 (Robbery with a Firearm): Remanded for Resentencing.